DENNIS RAY WYRICK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wyrick v. Commissioner
Docket No. 8373-71.
United States Tax Court
T.C. Memo 1976-268; 1976 Tax Ct. Memo LEXIS 135; 35 T.C.M. (CCH) 1176; T.C.M. (RIA) 760268; August 23, 1976, Filed Dennis Ray Wyrick, pro se. [1]
Richard D. Hall, Jr., and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION @DAWSON, Chief Judge: This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. The parties have filed no exceptions of law or fact to Special Trial Judge Caldwell's report. The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: This case is one of a group of 37 which were *137 consolidated for trial, but not for opinion. At the trial, evidence was received which bears upon every case in the group. Such evidence relates to certain contractual arrangements between the male petitioners' employers, Lockheed Aircraft Service Company (hereinafter, "Lockheed") and Dynalectron Corporation (hereinafter, "Dynalectron"), and the United States Air Force, as well as the employment arrangements between field team members (such as the male petitioners) and such employers. Respondent determined a deficiency in petitioner's 1969 Federal income tax in the amount of $84. By amendment to his answer to conform the pleadings to the proof, respondent seeks an increased deficiency in the aggregate amount of $658.88, an increase of $574.88 over the amount determined in the statutory notice of deficiency. The principal issue for decision is whether all or any portion of the per diem payments received by petitioner from Dynalectron in 1969 is includible in gross income for that year under section 61(a)(1) of the Internal Revenue Code of 1954; [2] and if so, whether petitioner is entitled to deduct an amount equal to all or any portion of the includible per *138 diem payments, as away-from-home travel expenses under section 162(a)(2). If the per diem payments are found otherwise includible in income under section 61(a)(1), then should the per diem payments received by petitioner when he was in Korea and Japan in 1969 be excluded from gross income under section 911. FINDINGS OF FACT Petitioner filed his 1969 return with the Director of International Operations of the Internal Revenue Service. Petitioner's residence was at Meridian, Mississippi, when he filed his petition in this case. During 1969, petitioner served as a member of several Dynalectron field teams. That corporation, as well as Lockheed, had a contract with the United States Air Force during that year to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or support equipment. These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors. The contracts were for three years maximum duration, and those involved here were for the three fiscal years, *139 July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The record herein does not identify the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if the contractor got work to be performed under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work station to which *140 the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii) (e) below). (a) In the CONUS (No quarters and messing facilities furnished by the Government)--$11.00-Per day per man for Engineer and Leadman and $9.00-Per day per man for the remainder. * * * * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed or permanent domicile and this location, if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility to ascertain that the certification is valid. The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion *141 of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given year of a basic contract. However, completion of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of the Air Force and of the contractor would get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week or month. After *142 the projected field team complement had been worked out, the contractor would then proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field team work, that employee was advised that he was subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that the contractor only had a basic contract for a year and that it had no way of knowing whether or when it would receive work orders under that contract. It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion of the work order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central *143 area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time (although it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal year, Dynalectron likewise received two work orders. While in most instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. *144 During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor. One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. Instances occurred when the composition of the field team was changed as the result of the recommendation of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under the work order, the projected field team complement as worked out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, *145 irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There was no element of profit to the contractors in the per diem for which they sought reimbursement. Per diem paid to the field team employees who qualified therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. Field team members also received per diem during their initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. Petitioner was hired by Dynalectron *146 in August 1965 and was sent on assignment to Korea. Petitioner remained on foreign assignment in Korea and Japan until June 1967. At that time his employment was temporarily terminated, and he returned to the United States on leave of absence. On July 7, 1967, petitioner was rehired by Dynalectron and again sent back to the Orient where he served on numerous assignments in Korea and Japan until he returned to the United States on July 2, 1969. Petitioner was on leave of absence for approximately 30 days until he was assigned on August 1 to Key Field at Meridian, Mississippi, where he remained for the remainder of 1969. Petitioner was still assigned to Key Field at the time of trial in July 1972. Petitioner, in 1966 and 1967, advised Dynalectron that his "actual residence * * * fixed or permanent domicile" was at 510 S. Kingston Avenue, Rockwood, Tennessee. That is the home of his parents. Petitioner was born in Rockwood and lived there until he enlisted in the Air Force in 1961. After almost four years of service, he was discharged in March 1965.He obtained employment in Ozark, Alabama, for approximately four months, when, as before stated, he obtained employment with Dynalectron. *147 Petitioner has a bedroom in his parents' home, but he owns no property in Rockwood. Since enlisting in the Air Force, he has been in Rockwood only on visits during vacations, weekends, and leaves of absence from his employment. He has not been employed in Rockwood. He has maintained a bank account in Rockwood, purchased a car there, and is registered with a Selective Service local board in that city. His mother has always forwarded mail to him. Petitioner was unmarried in 1969, and lived in furnished rented quarters in Meridian during his assignment to Key Field. The record does not show what his living arrangements were in Korea or in Japan during the portion of 1969 when he was assigned in those two countries. In 1970, he married a young lady from Meridian, and they were still living in that city at the time of trial. Petitioner received per diem payments totalling $4,099 from Dynalectron in 1969 -- $2,839 in respect of his assignments in Korea and Japan in that year, and $1,260 in respect of his assignment in Meridian. He included none of those amounts in income on his 1969 return. In his statutory notice of deficiency, respondent determined that the $1,260 was includible *148 in petitioner's income under section 61. By amendment to his answer to conform the pleadings to the proof, respondent asserts that the $2,839 is also includible in petitioner's 1969 gross income. Petitioner claimed an exclusion from gross income, for earned income from sources without the United States under section 911(a)(2), in respect of the salary paid to him while in Korea and Japan.On audit, respondent recomputed the exclusion and increased the amount excludible. OPINION It must first be determined whether the per diem payments received by petitioner from Dynalectron in 1969 are includible in his gross income for that year. This question will initially be considered without reference to the impact of section 911. In very broad language, section 61(a)(1) provides that "gross income means all income from whatever source derived." The Supreme Court has construed this "broad phraseology" to evince a Congressional intention "to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized and over which the [petitioner had] complete *149 dominion" ( Commissioner v. Glenshaw Glass Co.,supra, p. 431); and thus they were gains. The Code contains no provision exempting per diem payments, as such, from taxation. Manifestly, then, the per diem payments in respect of the Meridian assignment were properly includible in petitioner's 1969 gross income; [4] and so would be the per diem payments in respect of the Korea and Japan assignments, unless section 911 is effective to exclude them from gross income.
Section 911(a)(2), provides in here relevant part, as follows: (a) General Rule.--The following items shall not be included in gross income and shall be exempt from taxation under this subtitle: * * * *
(2) Presence in foreign country for 17 months.--In the case of an individual citizen of the United States who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period amounts received from *150 sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such 18-month period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c). Section 911(b), insofar as here pertinent, defines "earned income" as "wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered." Petitioner was out of the United States for the requisite 510 days during the two-year period from July 1967 to July 1969. The per diem payments were not paid by the United States or an agency thereof; rather they were paid by a private contractor, Dynalectron, to its employee. It is not believed that the reimbursement by the United States to Dynalectron, pursuant to the basic contract, converts the per diem payments into payments to the employee by the United States.And, the per diem payments fall within the "other amounts" mentioned in section 911(b), and thus were earned income.See and compare Rev. Rul. 69-2381969-1 C.B. 195, which permitted *151 exclusion of a cost of living allowance paid to an employee who worked overseas. Accordingly, it is believed that the per diem payments received by petitioner in respect of his assignments in Korea and Japan are to be excluded from gross income, subject to whatever limitations are imposed by section 911(c). As to the Meridian-based per diem payments, they were properly included in petitioner's 1969 gross income, as previously stated. The question remains whether petitioner is entitled to deduct under section 162(a)(2) an amount equal to all or any portion of the includible Meridian per diem, as expenses of travel while away from home in pursuit of his trade or business as an employee of Dynalectron, Leo C. Cockrell,supra, p. 479. In the Cockrell case, it was pointed out that the Supreme Court, in Commissioner v. Flowers, 326 U.SS. 465, rehearing denied 326 U.S. 812, had laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home expenses: The expenses must be (1) reasonable and necessary traveling expenses, (2) incurred by the taxpayer while away from home, and (3) incurred in pursuit of business. In *152 the present case, the parties are apart on the point of whether petitioner was away from home. In the case of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether a taxpayer should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,$3 49 T.C. 557, 562 (1968).In furtherance of this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll, $1supra. For this purpose, temporary employment is the type which can be expected to last for only a short period of time. Beatrice H. Albert,13 T.C. 129, 131 (1949). *153 Two points emerge: Was petitioner's assignment to Meridian temporary, as opposed to indefinite? And, did he maintain two places of abode and thereby incur additional and duplicate living expenses? With respect to the first point, bearing in mind the contractual arrangements between Dynalectron and the Air Force, the employment arrangements between field team members and Dynalectron, petitioner's won peripatetic employment history in the Orient from 1965 to 1969, and viewing matters as of December 31, 1969, when petitioner had only been at Meridian for five months, it is believed that his 1969 Meridian assignment must be regarded as only temporary. With respect to the second point, whether petitioner maintained two places of abode while he was at Meridian and thereby incurred those additional and duplicate living expenses to mitigate the burden of which is the aim and purpose of section 162(a)(2), it is believed that the answer must be that he did not. It was in Meridian that petitioner ate, slept, and worked -- in short made his home -- and not in Rockwood or any other place.While stationed at Meridian, petitioner incurred his living expenses while working, and he therefore *154 did not incur or bear any additional or duplicate living expenses. Any expenses incurred at Rockwood during weekend trips to that city must be regarded as purely personal. Petitioner's ties to Rockwood, where he really had not lived for eight years (since leaving home to enlist in the Air Force), were not sufficient for that city to be regarded as his tax home. In summary, petitioner's tax home from August 1, 1969, to the end of that year was at his principal place of employment -- Meridian, Mississippi. It follows that he was at, not away from, his tax home during that period. Accordingly, he should not be entitled to any deduction under section 162(a)(2) for 1969. In accordance with the foregoing, Decision will be entered under Rule 155.
Footnotes
1. DeQuincy V. Sutton was counsel of record for petitioner at the time of trial. Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioner.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. Leo C. Cockrell,38 T.C. 470, 477-478, affd. (8th Cir.) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341. See also Fred W. Phillips,T.C. Memo. 1973-58↩.